**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| **RUMERO ZIEBELL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:23 CV 841** |
| | ) | |
| **NANCY MARTHAKIS, M.D., *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**OPINION and ORDER**

Before the court is the motion of defendant Nancy Marthakis, M.D., for summary judgment on plaintiff Rumero Ziebell's claim of unconstitutionally inadequate medical care under the Eighth Amendment. (DE # 59.) For the reasons set forth below, the motion is granted.

## I. BACKGROUND

In October 2021, Ziebell was an inmate at the Indiana State Prison ("ISP"), where Dr. Marthakis was employed as a physician providing care to inmate patients under a contract between Centurion Health and the Indiana Department of Correction. (DE # 59-1 ¶¶ 4–5.) On October 12, 2021, Ziebell reported to the medical unit after falling in the shower and injuring his left shoulder. (DE # 59-1 ¶ 8.) A nurse who assessed him first noted that she could visualize and feel a displacement of the shoulder. (DE # 59-1 ¶ 8.) Dr. Marthakis examined Ziebell after the nurse did, ordered an injection of Toradol for pain, and, believing the shoulder to be dislocated, attempted to manually manipulate it back into place, a maneuver that necessarily involves physical force and

that the parties agree can be painful. (DE # 59-1 ¶ 8.) When two attempts were unsuccessful, Dr. Marthakis sent Ziebell to the emergency room. (DE # 59-1 ¶ 8.)

At Franciscan Health Michigan City Hospital, an x-ray showed a mild acromioclavicular ("AC") separation, no fracture, and a glenohumeral joint in good alignment. (DE # 59-1 ¶ 9; DE # 59-2 at 17–25.) Ziebell was placed in a sling and discharged with instructions to avoid weight-bearing with his left arm for two weeks, take ibuprofen, and follow up with an orthopedic doctor. (DE # 59-1 ¶ 10; DE # 59-2 at 10–15.) Ziebell believed that the discharge paperwork named a specific orthopedic surgeon and separately instructed a two-to-three-day follow-up with his primary care provider, which he contends superseded any two-week timeframe. (DE # 69 at 4.) Dr. Marthakis was scheduled to see Ziebell the very next day, October 13, for a follow-up exam, but he did not appear; nursing staff called his housing unit three times attempting to locate him. (DE # 59-1 ¶ 11; DE # 59-2 at 16.)

On October 14, Dr. Marthakis received the hospital's records by fax. (DE # 59-1 ¶ 12.) The referral to an orthopedic specialist did not specify a timeframe. (DE # 59-1 ¶ 12; DE # 59-2 at 17–25.) Because mild AC separations typically resolve with conservative treatment, Dr. Marthakis contends she used her medical judgment to observe Ziebell's progress for about a month before pursuing a specialist referral. (DE # 59-1 ¶ 12.) Over the following weeks, Ziebell submitted several requests for healthcare reporting continued pain, and nursing staff responded to each, renewing and adjusting his pain medication from Tylenol 325 mg to Tylenol 500 mg Extra Strength. (DE # 59-1 ¶ 13; DE # 59-2 at 26–39.)

Dr. Marthakis examined Ziebell again on November 23, 2021, 42 days after the injury. (DE # 59-1 ¶ 14; DE # 59-2 at 40–48.) He was still wearing his sling and reported continued pain. (DE # 59-1 ¶ 14.) Dr. Marthakis renewed his Tylenol, added Mobic, ordered a new x-ray, and submitted a referral to an orthopedic specialist. (DE # 59-1 ¶ 14.) The new x-ray showed no fracture but a grade 3 AC separation, the same severity shown on the original emergency-room x-ray. (DE # 59-1 ¶ 14.) The Statewide Medical Director approved the referral. (DE # 59-1 ¶ 14.) Ziebell disputes the adequacy of this examination, characterizing it as "faulty, negligent, and conducted with deliberate indifference," without citing evidence beyond that assertion. (DE # 69 at 12; DE # 70 at 5.)

According to Dr. Marthakis, once a referral is made she has no role in scheduling the outside appointment; that process is handled by prison administrative staff coordinating with the specialist's office and, separately, by correctional staff arranging transport. (DE # 59-1 ¶¶ 15, 19.) In this case, Dr. Marthakis claims that the administrative assistant attempted to schedule Ziebell with an orthopedic specialist before the end of the year, but the specialist was booked into the new year. (DE # 59-1 ¶ 16.) Ziebell argues that Dr. Marthakis never attempted to schedule him with the specific surgeon he claims was named in the hospital discharge paperwork. (DE # 69 at 18.)

Ziebell was seen by an orthopedic specialist at Lakeshore Bone and Joint on January 4, 2022, 42 days after the November 23 referral. (DE # 59-1 ¶ 17; DE # 59-3 at 1–4; DE # 59-2 at 61–84.) According to the specialist's own notes, he recommended discontinuing the sling and treating Ziebell with NSAIDs, Tylenol, and ice as needed,

along with a home exercise program for range of motion and rotator-cuff strengthening, measures largely consistent with what prison medical staff had already been providing. (DE # 59-1 ¶ 17.) The specialist also discussed the future possibility of ligament reconstruction surgery if conservative treatment did not succeed, and instructed Ziebell to return in six weeks. (DE # 59-1 ¶ 17.) Ziebell contends that the specialist told him that surgery should have been performed as soon as possible after the injury and that the specialist could have operated at the January 4 visit. According to Ziebell, he was also told that because so much time had already passed, he needed sling removal and rehabilitation first, with surgery to follow only if rehabilitation failed. (DE # 68-2, Ziebell Decl. ¶ 30; DE # 69 at 18–19.) Ziebell attributes his subsequent development of "frozen shoulder" to this delay. (DE # 68 at 5–6.)

On February 10, 2022, Dr. Marthakis submitted paperwork for a six-week orthopedic follow-up appointment, which was approved on February 15. (DE # 59-1 ¶ 19; DE # 59-2 at 88–90.) On February 23, 2022, a nurse practitioner examined Ziebell and noted that he was not performing his prescribed exercises. (DE # 59-2 at 91–94.) Ziebell disputes this, stating that he told the nurse practitioner he could not perform the exercises because of pain, and that he had separately informed both Dr. Marthakis and the specialist of that fact in writing. (DE # 69 at 14.) Ziebell was transferred to the Wabash Valley Correctional Facility on March 9, 2022, before his next scheduled orthopedic appointment, and Dr. Marthakis had no further involvement in his care after that transfer. (DE # 59-1 ¶ 20; DE # 59-2 at 98–103.)

Ziebell sued, alleging that he suffered constitutional violations at the hands of Wexford Health of Indiana, Inc., and Dr. Marthakis. (DE # 12.) The court dismissed all claims other than a single count against Dr. Marthakis in her individual capacity for money damages under the Eighth Amendment for allegedly denying him adequate medical care by misdiagnosing his shoulder injury and delaying several months in referring him for outside treatment. (DE # 13.) Dr. Marthakis's first motion for summary judgment, which raised the issue of exhaustion, was denied. (DE # 42.) Dr. Marthakis has now moved for summary judgment on the merits. (DE # 59.) Ziebell responded (DE # 68), Dr. Marthakis replied (DE # 70), and the motion is now ripe for ruling.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 requires the entry of summary judgment against a party who, after adequate time for discovery, "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

To defeat a motion for summary judgment, the non-moving party must identify specific facts that establish the existence of a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Palmer v. Marion County*, 327 F.3d 588, 595 (7th Cir. 2003). In doing so, the non-moving party cannot rely on allegations or denials in its own pleadings, but must present new evidence in support of its position. *Anderson*, 477 U.S. at 248; *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994).

A dispute about a material fact is only genuine when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. If no reasonable jury could find for the non-moving party, there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The court's role in deciding a summary judgment motion is not to evaluate the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249–50; *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). The court must construe all facts presented on a motion for summary judgment in favor of the non-moving party, and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995).

The non-moving party's obligation to identify a genuinely disputed fact is sharpened by this district's local rules. Under N.D. Ind. L.R. 56-1(e), a court may find a fact is not genuinely disputed if the citation offered for it "does not include a page or paragraph number to evidence in the record which can be presented in an admissible form." A court need not "scour the record" for evidence that is potentially relevant but uncited. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 573–74 (7th Cir. 2017). Conclusory statements not grounded in specific, cited facts are not enough to defeat summary judgment, *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017) (citing *Bordelon v. Bd. of Educ. of the City of Chicago*, 811 F.3d 984, 989 (7th Cir. 2016)), and neither are

statements grounded in mere conjecture or speculation. *Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022).[1]

## III. DISCUSSION

Prisoners are entitled to adequate medical care under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A prisoner alleging unconstitutionally deficient care must show that he had an objectively serious medical need, and that the defendant acted with deliberate indifference to that need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Dr. Marthakis does not dispute, for purposes of this motion, that Ziebell's shoulder injury was objectively serious. (DE # 60 at 5.) The question is whether the record permits a reasonable jury to find that Dr. Marthakis was deliberately indifferent to it.

Deliberate indifference requires more than negligence, and more than a disagreement over the proper course of treatment. Medical malpractice, even gross negligence, does not amount to a constitutional violation. *Estelle*, 429 U.S. at 106. Nor does a mere difference of opinion between medical providers, or between a provider and a patient, over the appropriate course of treatment. *Estate of Cole v. Fromm*, 94 F.3d

[1] Ziebell's Statement of Material Facts in Dispute (DE # 69) does not follow the verbatim format contemplated by the local rules, but it does respond to each of Dr. Marthakis's numbered facts in turn, and much of it is supported, at least, by citation to Ziebell's own verified declaration. (DE # 68-2.) Mindful of the leniency afforded pro se litigants, the court has considered those responses. Where Ziebell's statements are unsupported by any citation to the record, are immaterial to the claim at issue, or rest on speculation about matters outside his personal knowledge, they do not create a genuine dispute of material fact. *See Weaver*, 28 F.4th at 820.

254, 261 (7th Cir. 1996). "Deliberate indifference is not medical malpractice; the Eighth Amendment doesn't codify common law torts." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). A medical professional's treatment decision is entitled to deference unless it represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013).

Ziebell advances two theories of deliberate indifference: that Dr. Marthakis misdiagnosed his shoulder and mishandled her attempt to treat it on October 12, 2021, and that she unconstitutionally delayed referring him to an orthopedic specialist. Neither survives summary judgment.

First, no reasonable jury could find that Dr. Marthakis's initial evaluation and treatment of Ziebell's shoulder amounted to deliberate indifference. A nurse examined Ziebell first and, based on her own visualization and palpation of the shoulder, concluded that it appeared dislocated. (DE # 59-1 ¶ 8.) Dr. Marthakis reached the same clinical impression and attempted a manual reduction. (DE # 59-1 ¶ 21.) When her attempts were unsuccessful, she did not persist or disregard the failure; she sent Ziebell to the hospital for further evaluation. (DE # 59-1 ¶¶ 8, 21.) This sequence of events, which involved Dr. Marthakis assessing, attempting an intervention, reassessing, and then escalating, is the opposite deliberate indifference.

Ziebell characterizes Dr. Marthakis's initial assessment as a "misdiagnosis" because the hospital's x-ray later showed an AC separation rather than a dislocation,

and he maintains, citing a printout from a website, that the two injuries are mutually exclusive. (DE # 68 at 2–3; DE # 69 at 16; DE # 70 at 4.) But Ziebell is not a medical professional, and his own account of what a website says about AC injuries is not competent evidence from which a jury could infer that Dr. Marthakis's contemporaneous clinical judgment — corroborated by an independent nurse's assessment — was anything other than a reasonable read of an injury. Even if a "misdiagnosis" occurs, it does not create a triable Eighth Amendment claim if the medical professional's judgment was rooted in accepted professional judgment, practice, or standards. *See Estate of Cole*, 94 F.3d at 261. Nor does the fact that the manipulation was painful help Ziebell; the parties agree that manual reduction necessarily involves the application of force, and Dr. Marthakis's uncontroverted testimony is that this was a standard, appropriate response to a shoulder that she and an independent nurse both believed to be dislocated. (DE # 59-1 ¶¶ 8, 21.)

Ziebell also cannot argue that Dr. Marthakis unconstitutionally delayed referring him to an orthopedic specialist. A delay in care may constitute deliberate indifference, but "whether the length of a delay is tolerable depends on the seriousness of the condition and the ease of providing treatment." *Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016). When an inmate brings a delay-of-care claim, he must present "verifying medical evidence" from which a jury could infer that the delay itself, as opposed to the underlying condition, caused some degree of harm. *Williams v. Liefer*, 491 F.3d 710, 714–15 (7th Cir. 2007) (citing *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996)). A plaintiff's own account of his diagnosis and ultimate treatment, without more, cannot

satisfy that requirement. *Barnes v. Wexford Health Sources, Inc.*, 177 F.4th 825, 834 (7th Cir. 2026).

The undisputed record shows that Dr. Marthakis's decision to pursue the aforementioned treatment before referring Ziebell to a specialist was medical judgment, not indifference. The hospital discharge paperwork did not specify a timeframe for the orthopedic referral. (DE # 59-1 ¶ 12.) Dr. Marthakis attempted to see Ziebell the very next day for a follow-up exam, but he did not appear, and nursing staff made three attempts to locate him. (DE # 59-1 ¶ 11.) Dr. Marthakis's decision to observe Ziebell's progress for about a month before referring him out reflects the kind of clinical judgment call to which medical professionals are entitled deference, especially in cases like this one where there is no evidence of "obdurate refusal" to engage specialized expertise in the face of a known or obvious need. *Pyles v. Fahim*, 771 F.3d 403, 412 (7th Cir. 2014). Ziebell was not ignored; he was seen and treated by nursing staff on multiple occasions, and his pain medication was adjusted upward. (DE # 59-1 ¶ 13; DE # 59-2 at 26–39.) When Dr. Marthakis examined him again on November 23 and his x-ray showed no improvement, she promptly ordered a new x-ray and submitted the specialist referral that same day. (DE # 59-1 ¶ 14.)

It is undisputed that once that referral was submitted, Dr. Marthakis had no control over when the outside specialist's office could schedule Ziebell or how quickly transport could be arranged. (DE # 59-1 ¶¶ 15, 19.) Ziebell alleges he should have been referred to a different surgeon, but a disagreement about which of two orthopedic providers a patient sees is not a constitutional violation. *See Estate of Cole*, 94 F.3d at 261.

Ziebell was seen by an orthopedic specialist 42 days after the referral, and that specialist's own recommendations (NSAIDs, Tylenol, ice, and a home exercise program) were largely a continuation of the care Dr. Marthakis had already been providing. (DE # 59-1 ¶ 17; DE # 59-3 at 1–4.) Ziebell has identified no evidence that a different or earlier course of treatment would have provided any benefit. *See Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1033–34 (7th Cir. 2019).

Ziebell's remaining evidence of harm from the delay is his own declaration that the specialist privately told him surgery should have been performed sooner, and that the delay caused him to develop what he calls "frozen shoulder," requiring more extensive surgery than he otherwise would have needed. (DE # 68-2, Ziebell Decl. ¶ 30; DE # 68 at 5–6.) That is exactly the kind of unsupported lay diagnosis and causation testimony that *Barnes* prohibits. A diagnosis of Ziebell's condition, and any opinion about whether it was caused by a period of conservative treatment rather than by the underlying separation itself, requires expert medical testimony, not his own recollection of an alleged conversation. *See Barnes*, 177 F.4th at 834. In short, because Ziebell has presented no verifying medical evidence, no reasonable jury could find that a delay between his injury and his specialist visit caused him harm beyond that caused by the AC separation itself. *See id.*; *Gabb*, 945 F.3d at 1034.

To the extent Ziebell's claim rests on events after Dr. Marthakis submitted the November 23 referral, the record does not support a finding of deliberate indifference on her part. Dr. Marthakis timely submitted paperwork for Ziebell's six-week follow-up appointment on February 10, 2022, which was approved five days later. (DE # 59-1 ¶

19.) The February 23, 2022, examination that Ziebell disputes was conducted by a nurse practitioner, not Dr. Marthakis, and Ziebell identifies no evidence that Dr. Marthakis was even aware of what transpired at that visit. (DE # 59-2 at 91–94; DE # 69 at 14.) Dr. Marthakis's uncontroverted testimony is that she had no further involvement in Ziebell's care after his March 9, 2022, transfer to the Wabash Valley Correctional Facility. (DE # 59-1 ¶ 20.) Because Ziebell's claim proceeds against Dr. Marthakis individually, and *Farmer* requires proof that she herself knew of and disregarded an excessive risk to his health, care provided by other staff cannot establish that she was deliberately indifferent. *See Farmer*, 511 U.S. at 837.

## IV. CONCLUSION

For the reasons set forth above, the motion of defendant Nancy Marthakis, M.D., for summary judgment is **GRANTED.** (DE # 59.) Because all claims have been resolved with respect to all defendants in this case, the Clerk is instructed to **ENTER FINAL JUDGMENT** stating:

> Judgment is entered in favor of Nancy Marthakis, M.D., and Wexford Health of Indiana, Inc.; and against plaintiff Rumero Ziebell, who shall take nothing by way of his complaint.

**SO ORDERED.**

Date: September 28, 2026

s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT